**In re PRO–PAC, INC., Debtor.**

**Pro–Pac, Inc., et al., Plaintiffs,**

**v.**

**George Chapes, III, et al., Defendants.**

**Bankruptcy No. 06–26608–svk.**
**Adversary No. 07–2110.**

United States Bankruptcy Court,
E.D. Wisconsin.

Sept. 27, 2011.

Evan Schmit, Jerome R. Kerkman, Joseph R. Cincotta, Kerkman & Dunn, Milwaukee, WI, for Plaintiffs.

William P. Dineen, Crivello Carlson, S.C., Brett B. Larsen, David J. Hanus, Kristofor L. Hanson, Noah D. Fiedler, Hinshaw & Culbertson, LLP, Milwaukee, WI, for Defendants.

## MEMORANDUM DECISION

SUSAN V. KELLEY, Bankruptcy Judge.

### Introduction

This is a case where a sweet deal went sour for one of the parties. David and Linda Sarna wanted to expand and diversify their packaging business, Pro–Pac, Inc., and decided that warehousing and transportation were compatible business lines. The Sarnas turned to a family friend, George Chapes, a well-connected veteran of the industry with a stable of valuable contacts. Chapes signed a confidentiality agreement in May 2005, and soon began work as Pro–Pac's vice president for sales. But rather than boost Pro–Pac's business as the Sarnas envisioned, Chapes steered sales, including a lucrative sugar storage contract, to Pro–Pac's competitor, WOW Logistics Company ("WOW").

Pro–Pac filed a Chapter 11 petition on November 20, 2006; the case culminated in confirmation of a liquidating Chapter 11 plan on August 31, 2007. Meanwhile, on May 19, 2007, Pro–Pac and the Sarnas filed this adversary proceeding against Chapes and WOW.[1] The Complaint alleges that Chapes, aided and abetted by WOW, breached his duty of loyalty to Pro–Pac by diverting certain accounts to WOW. On March 19, 2010, the Court granted partial summary judgment, limiting the scope of the suit. The Sarnas' personal claims were dismissed, and Pro–Pac's claims against WOW and Chapes were reduced to the diversion of two accounts: Vangard and Pets International. With the narrowing of the issues for trial, the parties unsuccessfully attempted mediation.

On June 7 and 8, 2011, the Court conducted the trial, and considered various exhibits and the testimony of David Sarna, Gerald Krug, Jamie Wally, Tom Pelafas, and George Chapes. WOW had filed a pre-trial Motion to exclude certain testimony related to Pro–Pac's damages; the Court held that Motion in abeyance. At the conclusion of the second day of trial, the parties agreed that the remaining evi-

---

1. The Complaint originally also named Patti Group, Inc., another competitor that allegedly assisted Chapes. The Court granted Patti Group's Motion for Summary Judgment, dismissing Patti Group from the litigation on May 13, 2009.

dence and arguments could be presented through deposition transcripts and post-trial briefs. At that time, Pro–Pac also abandoned the claims regarding Pets International. The sole remaining issue is whether Pro–Pac is entitled to damages based on Chapes' and WOW's alleged scheme to commandeer what is known as the "Vangard deal" for their own benefit. Specifically, this Court must decide whether Pro–Pac proved that (1) Chapes breached his fiduciary duty to Pro–Pac by steering the Vangard deal to WOW; and (2) WOW intentionally aided and abetted Chapes' breach of his fiduciary duty for its own profit. Pro–Pac claims that it is entitled to a judgment against WOW and Chapes for $467,220 in actual damages, plus punitive damages of three times the amount of actual damages. Alternatively, Pro–Pac asserts it is entitled to unjust enrichment damages against WOW in the amount of $385,000.

## Jurisdiction

■ This adversary proceeding involves state law claims that a former employee breached his fiduciary duty to the Chapter 11 debtor prior to the filing of the bankruptcy petition; the confirmed plan in this case dedicates the proceeds of the claim to the unsecured creditors. While this proceeding does not arise under Title 11 of the United States Code nor arise in a case under Title 11, the adversary proceeding is "related to" a case under Title 11. See 28 U.S.C. § 157(a). Accordingly, this Court has jurisdiction over this proceeding via referral from the district court under 28 U.S.C. § 157(a).

■ The referral does not end the jurisdictional inquiry. Under 28 U.S.C. § 157(b), the bankruptcy court has authority to enter final judgments in proceedings related to bankruptcy cases only if the proceedings are "core proceedings." If a proceeding is not a core proceeding, unless the parties consent, the bankruptcy court can hear the matter, but cannot enter a final judgment. Instead, the bankruptcy court must make proposed findings of fact and conclusions of law for consideration by the district court. See 28 U.S.C. § 157(c). In the Complaint, Pro–Pac alleged that this is a core proceeding under § 157(b)(2)(O) as a matter affecting the liquidation of the assets of the bankruptcy estate. (Compl. ¶ 9.) WOW admitted this allegation in its Answer, indicating its consent to this Court's entry of a final judgment. (WOW Answer ¶ 5.) Chapes stated that he lacked knowledge and information sufficient to form a belief as to the allegation that this is a core proceeding, and denied the allegation. (Chapes Answer ¶ 8.) However, Chapes subsequently entered into a Stipulation pursuant to 28 U.S.C. § 157(e) consenting to this Court's conduct of a jury trial in this adversary proceeding.[2] That Stipulation effectively demonstrates Chapes' consent to the trial of this matter as a core proceeding. See In re K & R Express Sys., 382 B.R. 443, 448 (N.D.Ill.2007) (consent to jury trial equates with consent to final judgment being entered by bankruptcy court, because proposed findings and conclusions could not be entered in jury trial).

■ The Supreme Court's recent decision in Stern v. Marshall, —— U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), limited the authority of the bankruptcy court to enter final judgments on certain state law counterclaims even though counterclaims to proofs of claim are denominated as core proceedings in 28 U.S.C. § 157(b)(2)(C). However, Stern confirms that the bankruptcy court has the authori-

2. Although the District Court authorized this Court to conduct a jury trial by Order entered on August 24, 2007, the jury trial request was subsequently withdrawn.

ty to render final judgments even in non-core proceedings with the consent of the parties. The Supreme Court stated: "Section 157 allocates the authority to enter final judgment between the bankruptcy court and the district court. *See* § 157(b)(1), (c)(1). That allocation does not implicate questions of subject matter jurisdiction. *See* § 157(c)(2) (parties may consent to entry of final judgment by bankruptcy judge in non-core case)." *Id.* at 2607. Since WOW and Chapes clearly consented to this Court's entry of a final judgment on Pro–Pac's Complaint, even if this action is a non-core proceeding, this Court has both the subject matter jurisdiction and authority to proceed.

### Facts[3]

The Sarnas incorporated Pro–Pac in 1999, with Linda Sarna as president and David Sarna as secretary/treasurer. The Sarnas were the sole officers, shareholders and directors of Pro–Pac. In June 2005, Pro–Pac hired Chapes as the vice president of sales, with a salary of $84,000, a company vehicle, an expense account, and health insurance.[4] (Trial Tr. Vol. 1, 31, 32; Pro–Pac Ex. 5.)

In August 2005, Pro–Pac subleased a 148,250–square foot warehouse facility in East Troy, Wisconsin from WOW. WOW is a third party logistics (or "3PL") service provider, operating public warehouses in Wisconsin, Illinois, and Idaho and brokering transportation services for customers around the country. (Stip. of Facts ¶¶ 6, 7.) Around the time that Pro–Pac sub-

leased the East Troy warehouse, WOW was looking to exit some southeast Wisconsin markets, but to expand its operations in Illinois. (Stip. of Facts ¶ 18.)

In early 2006, WOW asked Pro–Pac if it would be interested in leasing another warehouse in Grafton, Wisconsin. (Stip. of Facts ¶ 19.) As in East Troy, WOW hoped that Pro–Pac could take over the business in Grafton and remain WOW's tenant. (Stip. of Facts ¶ 20.) David Sarna traveled to Grafton on April 6, 2006 to discuss the deal with WOW. (Stip. of Facts ¶ 2 1.) Jamie Wally, WOW's senior vice president of sales and marketing, attended the meeting and raised WOW's use of Chapes as a consultant to develop business for WOW in Illinois. (Stip. of Facts ¶¶ 22, 23.) Sarna testified that he was taken aback when Wally "made a comment . . . about us not minding if they were using [Chapes] to fill some warehouse space." (Trial Tr. Vol. 1, 64, 65.) Sarna said the comment threw him for a loop because Chapes never revealed that he was sharing information and contacts with WOW. (Trial Tr. Vol. 1, 65.) After the tour, Sarna, Wally, and Chapes met in the facility's conference room. Wally again stated, "Are you sure you don't mind us using [Chapes] to fill some warehouse space?" (Trial Tr. Vol. 1, 65.) Sarna replied that he would need to speak further with Chapes. (Trial Tr. Vol. 1, 66.) Sarna confronted Chapes on the way home from Grafton. "I asked [Chapes] what the heck was going on? You know . . . why is [Wally] coming to me blindly about . . . using you?" (*Id.*) After

---

3. The parties reached a comprehensive stipulation of facts, some of which are included here, along with trial testimony, stipulated deposition testimony and exhibits received into evidence. The trial transcript is divided into three volumes, with the first two volumes covering the testimony on June 7, 2011 and the third volume covering the testimony on

June 8, 2011. References to the transcript are designated accordingly.

4. Chapes' compensation package was significantly more generous than that given to members of Pro–Pac's sales force. Other salesmen received a base salary of $52,000 plus commission of 2% to 4% depending on the revenue created. (Trial Tr. Vol. 1, 35.)

a long pause, Chapes explained that Wally had approached him about filling warehouse space for WOW in Madison and that he was just appeasing Wally until Pro–Pac made a decision regarding the Grafton facility. (*Id.*) Sarna was upset and told Chapes, "from this point forward ... if you are working with WOW or there's something going on, I need to know what's happening. They're our landlord. This is too close to home." (*Id.*) Sarna said Chapes agreed and apologized. (Trial Tr. Vol. 1, 67.) The Grafton warehouse sublease that was the subject of the meeting never materialized, but Wally's comments regarding Chapes' assistance in filling warehouse space for WOW sparked months of negotiations. (Stip. of Facts ¶ 24.) Sarna and Wally conducted the negotiations via telephone and email.

### Negotiations for rent concessions

The emails reveal that Sarna sought lease concessions from WOW at the East Troy facility in exchange for permitting Chapes to consult with WOW. On July 17, 2006, Sarna sent an email to Wally detailing his demands for a workable agreement. (WOW Ex. 1002.) According to this opening email, Sarna's objective was to increase revenues for WOW in its open buildings, and then to "put a 'true partnership' together to successfully go after" an opportunity in Melrose Park, Illinois. (*Id.*) Sarna reiterated that while he was open to risk and willing to allow Chapes to assist WOW, his priority was to grow his own business and that "[Chapes] plays heavily into those plans and is a very expensive and valuable asset to Pro–Pac." (*Id.*) As compensation for sharing this valuable resource, and in light of the fact that Pro–Pac was subleasing the East Troy warehouse from WOW, Sarna requested three months of free rent each year, and an extension of the lease term for an additional two years at the current rate of $38,500 per month. Sarna con-

firmed that Chapes was involved in the decision to seek the rent concessions, and wrote that the rent concessions approach minimized the risk that Chapes' assistance to WOW might jeopardize Pro–Pac and ensured that Pro–Pac's relationship with Chapes remained "open and honest." (*Id.*)

Citing the risk that Chapes might not be successful in filling warehouse space for WOW, Wally counteroffered with one month free rent and a second month free on the condition that Chapes closed a deal for WOW. (WOW Ex. 1003; Trial Tr. Vol. 1, 74; Vol. 3, 126–28.) On July 31, 2006, Sarna responded to this counteroffer, requesting two months' rent free rent, and the third month free when Chapes closed a deal for WOW, plus a two-year lease extension. (WOW Ex. 1003.) To convince Wally that Chapes had valuable contacts that could generate business for WOW, Sarna stated, "Talk freely with [Chapes] about other opportunities that exist for WOW and let me know if you would like to proceed." (*Id.*) Additional emails and telephone conversations ensued, including an August 3, 2006 email in which Sarna pointedly requested a reply from WOW. Sarna testified about Wally's response: "WOW had offered us the two free months, the $3,000 a month per—per month for George's deferred salary, instead of us having to pay him. And lowering the rack payment $500." (Trial Tr. Vol. 1, 84.) Sarna rejected this proposal on August 8, 2006, informing Wally that "[Chapes] and I had ample time to discuss this consulting opportunity and at this time we both feel that we should keep things the way they are." (WOW Ex. 1006.) In the email, Sarna explained that "there is entirely too much revenue at stake," and confirmed that Pro–Pac was looking for "better lease terms" rather than the "pitfalls that commission deals ultimately bring." (*Id.*) Wally responded on August 9, 2006 stating,

"Thank you for being direct and open regarding your position. I guess it comes down to each of us having a different vision of how we see this relationship working. At this time I think it best if we 'agree to disagree' and table the idea for now. We can always revisit in the future." (*Id.*) Sarna replied on August 9, 2006 agreeing to stay in touch regarding future developments and wishing Wally luck in his ventures. (*Id.*) When the negotiations concluded without a deal, Sarna told Chapes not to have contact with Wally, stating: "We're done with these guys. We've wasted enough time. I don't want you to doing anything with them." (Trial Tr. Vol. 1, 87.) According to Sarna, Chapes agreed.[5] (*Id.*)

### The Vangard deal

On August 2, 2006, in the thick of the negotiations for Chapes' consulting services, George Van Denend,[6] the president of Vangard Distribution, Inc. ("Vangard"), telephoned Chapes. Chapes had known Van Denend, a veteran of the warehousing and trucking industries, since about 2000. (Stip. of Facts ¶ 42.) When interviewing with Sarna for a position with Pro–Pac, Chapes had pointed to Van Denend as one of his prize contacts who definitely could be an "ally" for Pro–Pac. (Trial Tr. Vol. 1, 30.) Van Denend called Chapes with a request from Tom Pelafas, Vangard's director of sales and marketing. One of Vangard's largest customers, United Sugar, was seeking a warehouse near Chicago to store 500 to 700 semi-truckloads of sugar. (Stip. of Facts ¶¶ 38, 40; Trial Tr. Vol. 3, 181; George Van Denend Dep. 34.) The

catch was that the sugar would be arriving by the end of August, and United Sugar needed to know within 24 hours whether the space could be secured. (Trial Tr. Vol. 3, 181; Raymond Smith Dep. 14–15; Van Denend Dep. 51–52.) Chapes suggested that Van Denend or Pelafas contact Wally. (Stip. of Facts ¶ 49.) Chapes then called Wally to inform him of the Vangard/United Sugar opportunity and told him to contact Pelafas. (Stip. of Facts ¶ 50.)

When the Vangard deal surfaced, WOW was in the process of finalizing a lease (which would go into effect on October 1, 2006) for a warehouse in Aurora, Illinois. (Stip. of Facts ¶ 53.) To accommodate the Vangard/United Sugar account on short notice, WOW quickly negotiated a short term lease to use the Aurora facility before October 1, 2006. (Stip. of Facts ¶ 54.) WOW successfully secured the Vangard account, and continues to store sugar in the Aurora facility to this day. (Stip. of Facts ¶ 57; Trial Tr. Vol. 3, 133.)

Although Wally and Sarna were in the middle of their discussions for WOW's use of Chapes' consulting services, neither Chapes nor Wally ever mentioned the Vangard deal to Pro–Pac. (Trial Tr. Vol. 1, 130, 131.) And when the negotiations for Chapes' services ended in early August, despite Sarna's directive that Chapes "have nothing to do with" WOW (Trial Tr. Vol. 1, 87), telephone logs show numerous phone calls between Chapes and Wally throughout August 2006; some of the calls were interspersed with calls between Van Denend and Chapes. (Pro–Pac Ex. 55.5, 55.6, 58.1.) Then, unbeknownst to Pro–

---

**5.** In his testimony, Chapes denied that Sarna placed any limits on his discussions with WOW. (Trial Tr. Vol. 3, 179.) The Court finds Sarna's testimony more credible in this regard.

**6.** Van Denend is also the vice president of operations and distribution for Sweetener

Supply. Vangard is the warehousing arm of Sweetener Supply and operates a warehouse facility in Berwyn, Illinois, about ten miles west of downtown Chicago. (Stip. of Facts ¶ 32.) Sweetener Supply is a seller of various sugar and food products based in Brookfield, Illinois. (Stip. of Facts ¶¶ 31, 41.)

Pac, beginning in August 2006, WOW began to issue checks to Chapes in compensation for the Vangard deal. (WOW Ex. 1008.) A week after Pro–Pac filed its Chapter 11 petition, on November 28, 2006, Sarna wrote a letter to Wally stating, "I would prefer if you contact Linda or myself with questions or concerns rather than [Chapes]. I do not object with you talking with [Chapes] so long as we are included in the conversations." (Pro–Pac Ex. 35.) Yet, both Chapes and Wally continued to speak, aided by a disposable cell phone paid for by WOW. (Pro–Pac Ex. 36; WOW Ex. 1008; Trial Tr. Vol. 3, 60, 159, 160.) And WOW continued to pay Chapes for the Vangard deal, sending him checks totaling $6,490 (representing 2% of the gross revenues on the Vangard account through March 2007). (Stip. of Facts ¶ 56.) Chapes became an employee of WOW in early 2007. (Trial Tr. Vol. 3, 57, 58.)

### Discussion

#### Motion in limine

Preliminarily, the Court must decide WOW's Motion in Limine. The Motion sought to exclude Sarna's testimony that, based on market and industry rates, WOW might have agreed to pay a 10% commission on the gross revenues over the lifetime of the Vangard contract.[7] WOW asserts that Sarna lacks personal knowledge of commission rates, and that his testimony as to those rates would be extraneous and prejudicial. Fed.R.Evid. 602, 403.

Trial courts have broad discretion in ruling on evidentiary issues before trial. *See United States v. Chambers,* 642 F.3d 588, 594 (7th Cir.2011); *Cefalu v. Village of Elk Grove,* 211 F.3d 416, 426 (7th Cir.2000). A court should only grant a motion in limine when the evidence is clearly inadmissible for any purpose. *See Jonasson v. Lutheran Child & Family Servs.,* 115 F.3d 436, 440 (7th Cir.1997); *Thakore v. Universal Mach. Co. of Pottstown, Inc.,* 670 F.Supp.2d 705, 714 (N.D.Ill. 2009). The moving party bears the burden of establishing that the evidence is not admissible for any purpose. *See Mason v. City of Chicago,* 631 F.Supp.2d 1052, 1056 (N.D.Ill.2009).

First, the Court rejects WOW's argument that Sarna lacks personal knowledge regarding commission percentages on deals similar to the Vangard deal. WOW argues that Sarna's personal knowledge is merely speculative because Sarna is not a broker and his basis for assessing an industry standard commission rate is informed by only a handful of deals. WOW compares Sarna's testimony to the affiants in *Visser v. Packer Engineering Associates, Inc.,* 924 F.2d 655 (7th Cir.1991). In *Visser,* the plaintiff, a former employee of a consulting firm, alleged wrongful termination due to age discrimination. *Id.* Three "dissident employees" of the firm offered affidavits stating that the employer knew that the plaintiff was close to full pension, the plaintiff's age was a significant factor in the decision to terminate the plaintiff, and the employer had acted vindictively in the past. The affidavits were inadmissible because they did not report admissions by the employer about his motives in firing the plaintiff, and were not

---

7. As Pro–Pac has pointed out, the Court permitted testimony regarding Sarna's opinion of commission rates during the trial over WOW's objection. (Trial Tr. Vol. 1, 103–104; 117–118.) While the Court explicitly reserved judgment on the Motion at the conclusion of the trial, Pro–Pac argues that by permitting the testimony, the Court effectively denied the Motion at the trial. Regardless, any ruling on a motion in limine is not binding on the trial court and is subject to reconsideration during the course of a trial. *Ohler v. United States,* 529 U.S. 753, 120 S.Ct. 1851, 146 L.Ed.2d 826 (2000).

based on primary facts from which a reasonable person could infer that the employer's motive was to deprive the plaintiff of his pension. *Id.* at 659. Rather, the court noted, the affiants were impermissibly presenting evidence of the employer's bad character to prove an act in conformity with that character.

It is true that "personal knowledge" includes inferences—all knowledge is inferential—and therefore opinions. But the inferences and opinions must be grounded in observation or other firsthand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience. *Id.* (internal citations omitted). Here, Sarna based his opinion on 10 years of experience in the packaging and logistics industry. Also, Sarna's testimony is based on an admission by WOW in an unconsummated deal with Smurfit Stone in 2005 in which WOW requested a 10% commission. Sarna reported primary facts—a deal under negotiation—from which a reasonable person in his position could infer a brokering fee for the Vangard deal. Unlike in *Visser,* Sarna was not testifying about WOW's reputation to pay high commissions nor Sarna's hunch on what an appropriate commission should be. Instead, Sarna testified credibly, based on his experience and the party-opponent's own statement, that a 10% commission was appropriate. Pro–Pac did not advance Sarna as an expert witness, and his testimony should not be judged by the standard applicable to experts. Rather, Sarna's testimony is admissible as opinion testimony by a lay witness. Fed.R.Evid. 701. Whether Sarna's experiences are sufficient to make his inference plausible is a question for a trier of fact.

The Court also rejects WOW's argument that admission of this testimony is extraneous and prejudicial. Relevant evidence may be excluded under Rule 403 if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. Sarna's testimony is not extraneous because it relates to the Court's determination of damages in this case. The amount of the brokering fee that Pro–Pac could have earned if it received the Vangard referral is pivotal question and not an extraneous matter. Further, the probative value of Sarna's testimony is not outweighed by a potential for unfair prejudice. Pro–Pac is entitled to offer testimony to establish its damages. Accordingly, the Court denies the Motion.

### Liability

Pro–Pac asserts that both Chapes and WOW are liable for the damages they caused by hiding the Vangard deal. Chapes and WOW disclaim any liability, arguing that the Vangard deal was never Pro–Pac's corporate opportunity. The Court will discuss the liability of each defendant in turn.

### Chapes' liability

The threshold question is whether Chapes breached his fiduciary duty by diverting the Vangard deal to WOW. To prove a claim for breach of fiduciary duty, a plaintiff must establish that: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that duty; and (3) the breach caused the plaintiff's damage. *Berner Cheese Corp. v. Krug,* 2008 WI 95, ¶ 40, 312 Wis.2d 251, 270, 752 N.W.2d 800, 809.

### Fiduciary duty

Wisconsin courts impose a fiduciary duty of loyalty upon "key" employ-

ees. *Burbank Grease Servs., LLC v. Soko-lowski,* 2006 WI 103, ¶ 42, 294 Wis.2d 274, 304, 717 N.W.2d 781, 796. The duty of loyalty extends to employees who are not corporate officers or directors. *See Info-Corp, LLC v. Hunt,* 2010 WI App 3, ¶ 21, 323 Wis.2d 45, 780 N.W.2d 178 (citing *Burg v. Miniature Precision Components, Inc.,* 111 Wis.2d 1, 330 N.W.2d 192 (Wis. 1983)). For example, in *InfoCorp,* an employee who was not an officer or director used his authority to divert business from his employer by withholding customer orders and attempting to shift business to a competitor. The Wisconsin Court of Appeals reversed the trial court's grant of summary judgment, and held that the employer was entitled to a trial on whether the employee breached his duty of loyalty to his employer. 323 Wis.2d 45, ¶¶ 31, 32, 780 N.W.2d 178.

■ Whether an employee is a key employee depends on the nature of the employee's duties. *Burbank Grease,* 294 Wis.2d 294, ¶ 42. An examination of Chapes' duties, responsibilities and compensation establishes that Chapes was a key employee. At his request, Chapes' title was vice-president of sales (Trial Tr. Vol. 1, 32), and Chapes was in charge of sales and marketing for Pro–Pac. (Trial Tr. Vol. 3, 182, 183.) Even prior to being hired, Chapes insisted that he be in complete control of all of his accounts, answerable only to Sarna. (Trial Tr. Vol. 1, 31.) Pro–Pac expected Chapes to use his contacts in the industry to help Pro–Pac fill warehousing space. (Trial Tr. Vol. 3, 193–94.) Given his experience and extensive network, Chapes received more generous compensation than other members of Pro–Pac's sales force. (Trial Tr. Vol. 1, 35.) Chapes received an $84,000 salary and various perks. (Trial Tr. Vol. 2, 62; Vol. 3, 199.) This summary of Chapes' duties and responsibilities leaves no doubt that Chapes was a "key employee," and owed a fiduciary duty to Pro–Pac.

Chapes counters that Sarna blurred the line of his fiduciary duties when Sarna began negotiating with Wally for Chapes' services and that Sarna encouraged Chapes to share opportunities with WOW. Sarna testified that the idea of sharing Chapes with WOW came out of the blue, and at first made him uneasy. (Trial Tr. Vol. 1, 66, 67.) He warmed to the idea when Sarna realized that Chapes' contacts could create leverage for rent concessions for Pro–Pac at the East Troy facility. (Trial Tr. Vol. 1, 65.) While Sarna did permit Wally to meet with Chapes on his own, Sarna made repeated requests to be kept in the loop while negotiations were pending. When the negotiations collapsed, Sarna stated to Chapes, "We're done with these guys. We've wasted enough time. I don't want you to doing anything with them." (Trial Tr. Vol. 1, 87.) By requiring disclosure of Chapes' communications with Wally, and explicitly stating that he did not want Chapes "doing anything" for WOW, Sarna made it clear that Chapes' loyalties were with Pro–Pac, not WOW. The Court rejects Chapes' argument that Sarna encouraged Chapes to act for WOW's benefit in August 2006, finding that Sarna's testimony concerning his instructions to Chapes was more credible than Chapes' testimony that he was never given any direction in this regard.

Having concluded that Chapes was a key employee who owed a fiduciary duty to Pro–Pac, the next issue is whether Chapes breached that duty with regard to the Vangard deal.

*Breach of duty of loyalty*

■ An employee who owes a fiduciary duty of loyalty assumes a legal obligation "to act solely for the benefit of the principal in all matters connected with the agency, even at the expense of the agent's

own interests." *Zastrow v. Journal Commc'ns, Inc.*, 2006 WI 72, ¶ 31, 291 Wis.2d 426, 445–46, 718 N.W.2d 51, 60. Among other standards, *Zastrow* teaches that the duty of loyalty imposes upon the employee a legal obligation to (1) refrain from taking self-interested opportunities; (2) keep privileged information confidential; and (3) fully disclose all information that may be beneficial to the employer. 291 Wis.2d 426, ¶¶ 34, 35, 718 N.W.2d 51. The diversion of an employer's business by a key employee to a competitor certainly violates these standards. *See InfoCorp*, 323 Wis.2d 45, ¶¶ 31, 32, 780 N.W.2d 178.

 However, determining that an employee is liable for diverting business requires something more. The court must conclude that the actions of the disloyal employee prevented the employer from realizing a corporate opportunity in which the employer had an interest or expectancy. *See Racine v. Weisflog*, 165 Wis.2d 184, 190, 477 N.W.2d 326, 329 (Wis.App. 1991). To make this determination, Wisconsin courts use a two-pronged approach: First, the employer must demonstrate the existence of a corporate opportunity. Second, the burden shifts to the employee to show that despite the loss of the corporate opportunity, the employee did not breach a fiduciary duty. *Id.* at 195–96, 477 N.W.2d 326.

### Pro–Pac proved an interest in a corporate opportunity

 In considering whether Pro–Pac has established the corporate opportunity, the Court should scrutinize the corporation's ability to take advantage of the opportunity presented to and seized by the employee. *Id.* at 194, 477 N.W.2d 326. Among the circumstances to be considered are whether the opportunity relates to the corporation's business purpose and wheth-

er the corporation has the ability to pursue the opportunity through its resources. *Id.*

Pro–Pac argues the Vangard deal was a corporate opportunity because it could have leased or subleased warehouse space (including from WOW) or acted as a broker and earned a commission on the gross rent receipts of the Vangard deal. To substantiate its position, Pro–Pac argues that it had experience with arranging similar deals and that it could have utilized Chapes' expertise and connections to quickly arrange for the necessary warehousing space. (Trial Tr. Vol. 1, 105, 109, 110; Vol. 3, 197, 198.) WOW and Chapes argue that the Vangard deal was not a corporate opportunity for Pro–Pac because Pro–Pac could not have secured warehouse space within the 24–hour window required by Vangard. The implication is that Sarna did not have the experience or ability to find warehouse space in Chicago. But this argument ignores Pro–Pac's "valuable resource"—Chapes. Both Sarna and Chapes testified that Pro–Pac hired Chapes to use his connections to grow Pro–Pac's warehousing business. (Trial Tr. Vol. 1, 20; Vol. 3, 193.) Chapes previously worked in the Chicago area, and had valuable connections there. (Trial Tr. Vol. 3, 93.) In pre-employment negotiations with Sarna, Chapes showed him leather binders filled with business cards, and particularly pointed out Van Denend as an "ally" who could assist with securing Chapes' prized account. (Trial Tr. Vol. 1, 30.) About a year later, that potential Pro–Pac "ally" presented Chapes with a warehousing deal that fit squarely fit within Pro–Pac's business purpose. It is apparent that Chapes' knowledge and connections could have been employed to assist Pro–Pac in finding warehouse space within the given deadline, whether by negotiating a sublease of the Aurora facility with WOW or contacting a broker to find alternative space. Therefore, the facts here are readily distinguish-

able from the facts in *Weisflog*. 165 Wis.2d 184, 477 N.W.2d 326. In that case, an officer of a sheet metal stamping firm allegedly usurped a business opportunity by forming a tubular metal parts company. *Id.* at 188, 477 N.W.2d 326. The court denied the corporation's claim for misappropriation of a corporate opportunity, finding,

> An expert testified that metal stamping and tube bending are substantially dissimilar and that he is aware of no company that does both. This expert also testified that although his employer constantly sought to expand and diversify, it never pursued a tube-bending business because it did not have the equipment or expertise, and therefore relied on specialty companies for this service.

*Id.* at 197, 477 N.W.2d 326. In contrast, the warehousing opportunity presented by the Vangard deal to Pro–Pac—whether as sublessee, lessee, or broker—was precisely the kind of business which Pro–Pac was seeking to grow, and had hired Chapes to cultivate. Chapes argues that Pro–Pac's position is an "unreasonable after the fact rationalization that the Vaguard [sic] business was Pro–Pac's business." (Chapes Post–Trial Brief 7.) The Court disagrees. Both Pro–Pac and WOW were in substantially the same position as Wisconsin-based firms without instantly available Chicago-area food grade warehouse space. Although WOW was seeking tenants for its Aurora facility and was about to sign a lease beginning in October, WOW had not signed the lease as of August 2, 2006, and as of that date still needed more tenants for the space. (Trial Tr. Vol. 3, 117.) WOW had sought Pro–Pac's help, through Chapes, to fill its warehouse space and was negotiating to give Pro–Pac rent concessions if Chapes was able to fill warehouse space for WOW. (Trial Tr. Vol. 3, 126.) Yet, when the Vangard opportunity arose, Chapes did not inform the Sarnas, but rather ensured that WOW would be the sole beneficiary of the opportunity. Bypassing Pro–Pac allowed WOW to profit from the Vangard deal, without giving up any rent concessions in East Troy. Moreover, WOW surreptitiously paid Chapes a commission for the referral of the Vangard deal, even though Chapes was a Pro–Pac employee who had been told to have nothing to do with WOW.

Even assuming, as WOW argues, that it would have been impossible for Pro–Pac to lease or sublease space on Vangard's timetable, Pro–Pac had an expectancy in the referral that Chapes gave to Wally. Pro–Pac's valuable resource, Chapes, in the midst of the negotiations for WOW's paying for his services through rent concessions, helped WOW fill warehouse space without any compensation for Pro–Pac. Whether as the opportunity to broker or sublease the Vangard deal itself, or as the opportunity to use Chapes' connections to gain rent concessions, the Court finds that the Vangard deal was a corporate opportunity for Pro–Pac.

*Chapes did not meet his burden because he hid the Vangard deal*

 If the corporation can establish the existence of a corporate opportunity, the burden of proof then shifts to the defendant to prove that his actions do not constitute a breach of his fiduciary duty. *Weisflog*, 165 Wis.2d at 195–96, 477 N.W.2d 326. In this second prong of the analysis, consideration must be given to certain equitable factors, such as the relationship between the employee and the corporation, the circumstances before, during, and after the employee seizes the corporate opportunity, and whether the seized opportunity places the employee in direct competition with the corporation. *Id.* Central to this analysis is whether the corporation was "given the opportunity to

decide, upon full disclosure of the pertinent facts, whether it wishes to enter into a business that is reasonably incident to its present or prospective operations." *Suburban Motors v. Forester*, 134 Wis.2d 183, 193, 396 N.W.2d 351, 355 (Wis.App.1986) (citation omitted). Therefore, the Court considers whether despite failing to disclose the Vangard deal to Sarna, Chapes did not violate his fiduciary duty. *See Weisflog*, 165 Wis.2d at 195–96, 477 N.W.2d 326.

Chapes argues that he "reasonably believed the Vanguard [sic] deal presented no real opportunity for [Pro–Pac] and cannot be faulted for passing it on as a referral to WOW." (Chapes Post–Trial Br. 10.) This argument ignores that Pro–Pac, not Chapes, should have made the decision whether the deal presented an opportunity. In *General Automotive Mfg. Co. v. Singer*, 19 Wis.2d 528, 120 N.W.2d 659 (Wis.1963), a manager named Singer attracted a large volume of business after he was hired by Automotive. Singer decided that, due to Automotive's lack of suitable equipment or inability to quote a competitive price, Automotive could not service a certain customer's orders. Unbeknownst to Automotive, Singer quoted the customer a price, dealt with another machine shop to do the work at a lower price, and pocketed the difference. The Wisconsin Supreme Court stated that "Singer was actually behaving as a broker for his own profit in a field where by contract he had engaged to work only for Automotive." *Singer*, 19 Wis.2d at 532–33, 120 N.W.2d 659. Singer argued—as Chapes suggests here—that in Singer's opinion, Automotive was not capable of filling the orders, and Singer was free to refer those to others. But the Supreme Court took issue with Singer's failure to disclose the orders to General Automotive:

> [S]inger had the duty to exercise good faith by disclosing to Automotive all the facts regarding this matter. Upon disclosure to Automotive, it was the latter's discretion to refuse to accept the orders form Husco or to fill them if possible or to sub-job them to other concerns with the consent of Husco if necessary, and the profit, if any, would belong to Automotive.... By failing to disclose all the facts relating to the orders from Husco and by receiving secret profits from these orders, Singer violated his fiduciary duty to act solely for the benefit of Automotive.

*Id.* at 534–35. *Singer* teaches that the decision of whether an employer can take advantage of an opportunity belongs with the employer. In this case, Chapes was well aware of the pending negotiations for his consulting services, which included his network of contacts and referrals. When Chapes received the Vangard referral, he should have disclosed it to Sarna. Sarna might have agreed with Chapes that given the time constraints or other requirements, the Vangard deal should simply be referred to WOW. Or Sarna could have determined that the referral could be used in his negotiations with Wally for the rent concessions, or as part of a "partnership" as envisioned with the Melrose opportunity. Under *Singer*, the decision whether to refer the Vangard deal to WOW belonged to Sarna, not Chapes. Chapes seeks to bolster his position that he did not breach his fiduciary duty to Pro–Pac by stating that he did not seek anything in return for passing on the referral to Wally. (Chapes Post–Trial Br. 10.) Yet, WOW ultimately paid Chapes a $6,490 referral fee, which Chapes also kept to himself and did not disclose to Pro–Pac. (Stip. of Facts ¶ 56.) Under the circumstances, Chapes' alleged assumption that the Vangard deal presented no opportunity for Pro–Pac is inexcusable, and Chapes' failure to disclose the deal

to Sarna constitutes a violation of Chapes' fiduciary duty of loyalty to Pro–Pac.

### Causation

■■■■■ Pro–Pac argues that Chapes' breach is the direct cause for its failure to receive any benefit for the bargain it was attempting to negotiate with WOW. Wisconsin courts determine causation by asking whether the defendant's conduct was "substantial factor" in contributing to the result—in this case, Pro–Pac's lost opportunity. *Bruss v. Milwaukee Sporting Goods Co.*, 34 Wis.2d 688, 695, 150 N.W.2d 337, 340 (Wis.1967). To meet the burden of production with respect to causation, Pro–Pac must produce some credible evidence that Chapes' breach of fiduciary duty was more probably than not a substantial factor in causing damages to Pro–Pac. *Bruss*, 34 Wis.2d at 697, 150 N.W.2d 337.

The evidence demonstrates that Chapes had a network of contacts including Van Denend, who could help fill warehouse space. Pro–Pac hired Chapes at a generous salary to fill warehouse space for Pro–Pac, and, other than at Melrose, Pro–Pac wanted compensation if Chapes used his contacts to fill warehouse space for WOW. The Court finds credible Sarna's testimony that he told Chapes to keep him advised, and concludes that Chapes ignored that direction and referred the Vangard deal to WOW without disclosing it to Sarna. By failing to disclose the Vangard deal to Pro–Pac, Chapes deprived Pro–Pac of the opportunity to locate warehouse space for Vangard, and, perhaps more importantly, misappropriated an important bargaining chip in Pro–Pac's negotiations for rent concessions from WOW. WOW would certainly stand to benefit by using Chapes' services and connections for a 2% referral fee, rather than giving up thousands of dollars in rental income from Pro–Pac.[8] Conversely, Pro–Pac surely was damaged by Chapes' nondisclosure of the Vangard deal at a time when Sarna was negotiating with WOW for sharing Chapes' services. Therefore, the Court concludes that Chapes' referral of the Vangard deal to WOW without disclosing it to Sarna was a substantial factor contributing to Pro–Pac's lost opportunity and damages.

### WOW's liability

■■■■■ Having concluded that Chapes breached his fiduciary duty to Pro–Pac in his handling of the Vangard deal, the next issue is whether WOW is liable for aiding and abetting that breach. In order to establish a claim for aiding and abetting a breach of fiduciary, Wisconsin courts require the plaintiff to establish that the defendant intentionally encouraged and profited from the breach of loyalty. "A person who, without being privileged to do so, intentionally causes or assists an agent to violate a duty to his principal is subject to liability to the principal." *St. Francis S & L Ass'n v. Hearthside Homes, Inc. (St. Francis I)*, 65 Wis.2d 74, 81, 221 N.W.2d 840, 844 (1974) (quoting and adopting Restatement (second) of Agency § 312); *St. Francis Sav. and Loan Ass'n v. Hearthside Homes, Inc. (St. Francis II)*, 75

---

**8.** Jamie Wally's testimony confirms this:

Q And so you're aware, are you not, that as a result of Mr. Chapes referring Vanguard to you, you obtained the—you obtained the Vanguard work, right?
A Yes.
Q And you obtained all of that before August 9, 2006, right?
A Yes.

Q And you didn't have to pay any of the terms that were being negotiated or that were on the table with Pro–Pac at the time, right?
A Yes.
Q And after you concluded that transaction that's when you sent Mr. Sarna an email saying thank you, we can't come to an agreement, we'll agree to disagree, right?
A Yes. (Trial Tr. Vol. 3, 133.)

Wis.2d 476, 249 N.W.2d 924 (1977). "If a duty of loyalty exists, and a third party encourages and profits from a breach of the duty of loyalty, a claim for aiding and abetting the breach will lie." *Burbank Grease Servs.*, 294 Wis.2d 274, ¶ 43, 717 N.W.2d 781.

WOW asserts that Pro–Pac failed to establish its claim for aiding and abetting on five grounds: (1) WOW did not intend to assist Chapes in breaching his duty; (2) WOW did not cause Chapes' breach; (3) WOW did not profit through its actions; (4) WOW did not cause Pro–Pac any damages; and (5) Pro–Pac did not prove its claim by clear and convincing evidence. The Court rejects each of these arguments.

### *WOW intended to assist Chapes in breaching his duty*

According to Pro–Pac, the evidence establishes that WOW intentionally assisted Chapes in breaching his fiduciary duty by keeping the Vangard deal secret. Pro–Pac argues that WOW and Pro–Pac were in substantially the same position when Chapes received the Vangard referral. Neither firm had secured warehouse space in Illinois, yet both had been contemplating similar opportunities in partnership. Pro–Pac asserts that the parties' deliberations, as documented in several emails, were characterized by due diligence and full disclosure. Particularly, Pro–Pac and WOW mutually explored an opportunity—dubbed the Melrose opportunity—for Pro–Pac to provide warehousing near Chicago. Eventually, Sarna backed away from the Melrose opportunity after determining it would not be beneficial for Pro–Pac. (WOW Ex. 1003.) On July 31, 2006, Sarna informed Wally that he would take a back seat, and authorized Chapes to negotiate with Wally on the Melrose deal without his involvement. Sarna's email detailed the rent concessions he sought for allowing Chapes to fill warehouse space for WOW other than at Melrose. In closing he wrote, "Talk freely with [Chapes] about other opportunities that exist for WOW and *let me know if you would like to proceed.*" (WOW Ex. 1003.) Pro–Pac's interpretation of Sarna's email is that Wally knew that Sarna expected to be kept in the loop and never intended to "blindly forgo the next Melrose-type opportunity." (Pro–Pac Reply Br. 21.) Yet, when Chapes and Wally failed to disclose the Vangard deal to Sarna, that is precisely what happened. Only months later did Sarna learn that Pro–Pac had been cut out of the Vangard deal, which might have provided the leverage Sarna needed for rent concessions from WOW.

Wally and Chapes attempt to paint the Vangard deal as a commonplace "passive referral" outside the scope of the negotiations with Sarna. The Court concludes to the contrary—the deal was significant, unusual and far from ordinary course networking. Moreover, Chapes touted his connections with Van Denend and Vangard just a year before when Chapes and Sarna were discussing Chapes' potential employment with Pro–Pac. (Trial Tr. Vol. 1, 30, 81, 82.) Pro–Pac argues that these are not innocent circumstances. Rather, "Wally knew exactly what he was doing: teaming up with Chapes to keep an opportunity from Pro–Pac so the spoils would not be shared with it." (Pro–Pac Reply Br. 23.) The Court agrees. Wally was actively engaged in negotiations with Sarna at the time of the Vangard deal. The earliest conversations between Wally and Sarna regarding Chapes demonstrate that Wally believed he needed Sarna's permission before using Chapes to help WOW fill warehouse space. (Trial Tr. Vol. 1, 65.) And while the July 31, 2006 email invited Wally to speak freely with Chapes, WOW conveniently ignores the qualification that fol-

lows: "... *let me know if you would like to proceed.*" (WOW Ex. 1003.) It is disingenuous and self-serving for Wally to argue that he believed he had blanket freedom to "network" with Chapes and receive lucrative deals, while Sarna repeatedly asserted his involvement so that he could gain rent concessions. (Trial Tr. Vol. 3, 21.) Wally unquestionably knew that Chapes' value was his network of contacts, especially in Chicago. (Trial Tr. Vol. 3, 93, 99.) Wally also knew that Chapes was a key employee of Pro–Pac. (Trial Tr. Vol. 3, 9) (Q: What was your understanding of Mr. Chapes's job with Pro–Pac? A: He was the vice president of sales or in charge of sales. Primarily brought in to grow the warehousing aspect of Dave and Linda's Business). And Wally was well aware that Sarna was not offering Chapes' services pro bono.[9] (Trial Tr. Vol. 3, 26, 129.) Yet, Wally took the Vangard referral, acted on it, and never disclosed the deal to Sarna. If Wally did not intend to aid Chapes in breaching his fiduciary duty, then why would Wally fail to mention the referral to Sarna while negotiations were pending? The Court cannot conclude that such omission is an innocent oversight.

### WOW caused Chapes' breach

▇▇ WOW argues that it did not cause or induce Chapes to breach his duty because it did not offer compensation at the time of the referral. WOW's argument assumes that the breach was limited to the moment Chapes called Wally to make the referral. However, the Court views the breach as including the timeframe around the referral. Although WOW had rejected Pro–Pac's offer to share Chapes' services in a partnership, and Sarna had directed Chapes to stop working with Wally, tele-

phone logs from July 31, 2006 through August 31, 2006 demonstrate that Wally and Chapes had two dozen phone conversations, suggesting an ongoing relationship. (Pro–Pac Ex. 55.5, 55.6, 58.1; Pro–Pac Reply Br. 23–25.) The logs show ongoing contact between Chapes, Van Denend and Wally and strongly call into question Wally's testimony that Chapes had no involvement in the Vangard deal after the initial phone call on August 2, 2011. (Pro–Pac Ex. 55.5, 55.6, 58.1; Trial Tr. Vol. 3, 43.)

Further, the evidence casts doubt on the allegation that the referral was made without an agreement for compensation. WOW did compensate Chapes (while he was still a Pro–Pac employee, and unbeknownst to Pro–Pac) in the amount of $6,490. (Stip. of Facts ¶ 56.) At trial, Wally testified that WOW paid the referral fee on its own accord after Chapes gave the referral. (Trial Tr. Vol. 3, 43.) This scenario contradicts Wally's own account of referral fee customs in the industry. First, Wally testified that in his experience a referral fee is paid at the discretion of the referral recipient and is not expected "*unless it's discussed up front like any negotiation.*" (Trial Tr. Vol. 3, 17.) Second, in the absence of a referral fee, the referring party generally contemplates some other favor or concession down the road: "Typically, it's just pass on the lead and it's quid pro quo. I mean, we're ... giving opportunities between each other...." (Trial Tr. Vol. 3, 17, 18.) Wally's own testimony confirms how unusual it would be for a referral to be given without some expectation of either a commission or a reciprocal referral in the future. Yet,

---

9. *Wally's testimony on cross examination establishes he knew Chapes' services were not free:*

Q: And you knew that by July 31 Dave Sarna and Pro–Pac wanted something for George Chapes's services, isn't that right?
A: That's—Yes. We've been discussing that, yes. (Trial Tr. Vol. 3, 129.)

WOW suggests that an experienced salesman like Chapes would not have sought a benefit for his employer or himself for giving the referral. Moreover, the referral fee was not an arbitrary sum, rather WOW's monthly installment payments to Chapes directly tied to WOW's monthly revenues on the Vangard deal. (Trial Tr. Vol. 3, 43; Pro–Pac Ex. 37, 39, 59.) The fact that the referral fee was not a one-time payment, but was calculated based on monthly revenues, casts doubt on Chapes' characterization of the fee as a gift paid by WOW solely "through the goodness of their heart." (Trial Tr. Vol. 3, 184.) Also troubling is Wally's characterization that the compensation was in accord with "the *arrangement* with [Chapes]." (Trial Tr. Vol. 3, 44.) Wally explained further: "I mean if there was another arrangement with somebody else it could be negotiated differently." (*Id.*) Finally, the fact that the referral was received but not disclosed in the midst of Wally's negotiations with Sarna for rent concessions supports Pro–Pac's claim that WOW caused Chapes' breach.[10] Considering Wally's account of the industry practice for referral fees, together with the facts surrounding the referral fee paid to Chapes, against the background of Sarna's emails demanding rent concessions for WOW's use of Chapes' services, WOW's argument that it did not cause Chapes' breach simply is not plausible. Both Wally's testimony about the lack of communications with Chapes about the Vangard deal and Chapes' testimony that the referral fee was neither requested nor expected lack credibility. Either at the time of the referral or shortly thereafter, WOW provided a tangible incentive for

Chapes to keep the Vangard deal under wraps. Therefore, the Court concludes that WOW caused Chapes' breach.

*WOW profited through its actions*

■ WOW clearly has profited from Chapes' referral of the Vangard deal. First, by keeping Chapes' referral of the Vangard deal a secret, WOW did not have to grant Pro–Pac any rent concessions. In WOW's Answer to the Complaint, it reiterated how important the rental income from Pro–Pac was: "Collecting monthly rent of approximately $42,000 from [Pro–Pac] was far more valuable to WOW than any profit that might be realized by providing warehouse services to a customer who might otherwise use WOW's facility." (WOW Answer ¶ 37.) Second, the Court infers that because WOW eventually hired Chapes as an employee and WOW continues to service the Vangard account today, there must be at least some measure of profitability in the relationship for WOW.

*WOW caused Pro–Pac damages*

As discussed above, Pro–Pac has established that it was damaged by the failure of Chapes and Wally to disclose the Vangard referral; the measure of the damages will be addressed below.

*Pro–Pac proved its claim by clear and convincing evidence*

■ WOW argues that Pro–Pac must establish the elements of aiding and abetting by clear, satisfactory, and convincing evidence. WOW cites several court decisions assessing claims of undue influence to demonstrate that this heightened standard is the appropriate burden to apply. *See, e.g., Wangen v. Ford Motor*

10. At the initial meeting in Grafton, Wally asked Sarna more than once if Sarna minded that Chapes was helping WOW fill warehouse space. By the time of the Vangard referral, Wally was well aware that Sarna did mind, and wanted compensation for Pro–Pac, not Chapes, for referrals. Under these circumstances, acceptance of a referral, hiding it from Pro–Pac, and compensating Chapes, not Pro–Pac, clearly demonstrates WOW's active participation in Chapes' breach.

*Co.*, 97 Wis.2d 260, 299, 294 N.W.2d 437, 457 (Wis.1980); *Kuehn v. Kuehn*, 11 Wis.2d 15, 26–30, 104 N.W.2d 138, 145–47 (Wis.1960). The Court agrees that Pro–Pac must meet this middle burden of proof to establish that WOW aided and abetted Chapes' breach.

Wisconsin Jury Instruction—Civil 205 is instructive to the Court's analysis of whether Pro–Pac has met its burden. The instruction provides:

> Clear, satisfactory and convincing evidence is evidence which when weighed against that opposed to it clearly has more convincing power. It is evidence which satisfies and convinces you that "yes" should be the answer because of its greater weight and clear convincing power.
>
> "Reasonable certainty" means that you are persuaded based upon a rational consideration of the evidence. Absolute certainty is not required, but a guess is not enough to meet the burden of proof. This burden of proof is known as the "middle burden." The evidence required to meet this burden of proof must be more convincing than merely the greater weight of the credible evidence but may be less than beyond a reasonable doubt.

Wis. J.I.—Civil 205.

After due consideration of the clear, satisfactory, and convincing evidence discussed above, especially the evidence of the emails and discussions between Sarna and Wally about Pro–Pac's receipt of rent concessions in exchange for Chapes' consulting services, and Wally's failure to disclose the referral to Sarna while rejecting Sarna's demand for three months of free rent on the pretext that Chapes might not be successful in filling warehouse space for WOW, the Court determines that WOW, without privilege, aided and abetted Chapes in breaching his fiduciary duty to

Pro–Pac. Therefore, Pro–Pac has met its burden of proof. *St. Francis I*, 65 Wis.2d 74, 81, 221 N.W.2d 840.

The Court concludes that Chapes owed a fiduciary duty of loyalty to Pro–Pac; Chapes breached that duty by failing to disclose the Vangard deal; WOW encouraged the breach by compensating Chapes for the referral; and WOW profited from the breach by keeping Sarna in the dark, eliminating the need to grant rent concessions, and gaining a tenant who remains in WOW's warehouse today.

### Damages

Having found that Chapes breached his fiduciary duty to Pro–Pac by referring the Vangard deal to WOW, and that WOW intentionally aided and abetted Chapes' breach of his fiduciary duty for its own profit, the final issue is the measure of damages against WOW and Chapes. Pro–Pac asserts two theories of damages: First, Pro–Pac asserts that it would have earned a 10% commission on gross revenues for referring the Vangard deal to WOW, totaling $467,220. Second, Pro–Pac asserts that WOW was unjustly enriched by $385,000 in rent that WOW would trade for Chapes' services, and that WOW was unjustly enriched in that amount. The Court rejects Pro–Pac's first theory of damages due to lack of evidence, but awards unjust enrichment damages.

### Pro–Pac did not establish that it would have earned a 10% commission

■ Pro–Pac posits that the industry standard commission for negotiating a deal like the Vangard deal is 10%. However, the evidence presented by Pro–Pac does not support this finding. In his testimony, Sarna attempted to analogize the Vangard deal to another warehousing deal, Smurfit Stone. The evidence shows that in August 2005, WOW approached Pro–Pac regarding this opportunity. WOW had secured

the warehousing arrangement and negotiated a final price with Smurfit Stone, but was looking to transfer the opportunity to Pro–Pac for the East Troy Warehouse, in exchange for 10% of the revenue. (Trial Tr. Vol. 1, 113.) The Smurfit Stone transaction was never finalized and no commission was paid. (Trial Tr. Vol. 2, 72.) Pro–Pac asks this Court to find based on Sarna's testimony that because Wally requested 10% of the revenues on the Smurfit Stone deal, Pro–Pac also would have negotiated for and received a 10% commission on the Vangard deal. However, the Vangard deal was far from finalized on the day Van Denend called Chapes. Rather than a fully negotiated deal with a set price and parameters, like WOW's deal with Smurfit Stone, the Vangard opportunity was in its infancy, with specialized requirements and an extremely tight time-frame to finalize negotiations. Sarna used the unfortunate analogy of "apples and oranges" to describe the deals, but the Court deems the Smurfit Stone deal akin to a package tied up with a bow, while the Vangard deal was more like the opportunity to go shopping. (Trial Tr. Vol. 1, 111.)

From this tenuous connection, Pro–Pac reaches even further, suggesting that 10% is an industry standard, yet provided no industry expert testimony in support. The Court does not find sufficient competent evidence to support a 10% commission rate. No other rate was suggested by Pro–Pac or admitted by WOW. Wally testified that real estate commissions of 5% or 6% are common, but those commissions are for real estate brokers who find tenants or subtenants for property owners. (Trial Tr. Vol. 3, 64.) Because this Court does not find that Pro–Pac established that it would have received a 10% commission rate, the Court need not discuss Pro–Pac's expert's testimony on the present value of Pro–Pac's damages.

### Pro–Pac established that WOW and Chapes were unjustly enriched

 Pro–Pac argues that it is entitled to damages under a theory of unjust enrichment. WOW and Chapes argue that Pro–Pac is precluded from pleading this theory of damages because it was not specifically pled in the Complaint, and WOW objected to this theory at trial. Federal Rule of Bankruptcy Procedure 7015, incorporating Federal Rule of Civil Procedure 15(b)(1), provides:

> If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.

The Court noted and overruled WOW's objection at trial and does not find that WOW is prejudiced by permitting Pro–Pac to plead its theory of unjust enrichment.[11] (Trial Tr. Vol. 3, 134, 135.)

---

11. MR. HANUS: Your Honor, as long as you're on a little hiatus here, I also want to make clear that I am no way consenting to the trial claims that have been—such that there is a potential amendment to the pleadings or anything like that. I've said that before, I'll reiterate it now. I think there was a basis to ask the questions, but this isn't—
THE COURT: Okay. So noted.

. . .
Q Okay. From that deal Pro–Pac didn't receive any financial benefit, right?
MR. HANUS: Objection.
THE COURT: Can you rephrase it?
MR. KERKMAN: Sure.
BY MR. KERKMAN: Q Would the transaction involving Vanguard WOW did not provide Pro–Pac with any financial benefit, right?

The allegations concerning the negotiations between WOW and Pro–Pac for Chapes' consulting services have been part of Pro–Pac's claim since the Complaint. Paragraph 35 of the Complaint states: "Pro–Pac then contacted WOW about a possible consulting arrangement between Chapes and WOW." Also, a main emphasis of WOW's defense has been that in Sarna's July 31, 2006 email, he encouraged Wally to "talk freely" with Chapes about the opportunities for business referrals. (WOW Ex. 1006; Summ. J. Tr. 18, March 1, 2010.) WOW has continually interpreted the email as Sarna's condoning and encouraging WOW to talk to Chapes without any expectation of payment for Pro–Pac. (Summ. J. Tr. 18.) But that interpretation completely ignores the second part of the sentence: "Talk freely with [Chapes] about other opportunities that exist for WOW and *let me know if you would like to proceed.*" The Court has rejected WOW's reading of this email, finding that the email and the balance of the evidence in the case supports Pro–Pac's claim that Pro–Pac should have been informed if WOW wanted to proceed with an opportunity referred by Chapes. The context of Sarna's email, upon which WOW has heavily relied throughout this dispute, is that Pro–Pac was attempting to negotiate rent concessions in return for WOW's receipt of referrals from Chapes. Since the allegations concerning the rent concessions have been an integral part of this case, Pro–Pac's amendment of its claim to seek unjust enrichment damages for the lost rent concessions does not prejudice WOW. *See* 5 Charles A. Wright, et al., Federal Practice And Procedure: Civil 3d § 1255 (3d ed. 2004) ("The liberal policies reflected in Rules 15(a) and 15(b) permit the demand to be amended either be-

fore or during trial. Moreover, under Rule 54(c) ... the district court may grant any relief to which the evidence shows a party is entitled, even though that party has failed to request the appropriate remedy or remedies in his pleading."). The amount of damages to be recovered is based upon the proof, not the pleadings. *See* Fed.R.Civ.P. 54(c). Given the lack of prejudice to WOW in considering the evidence Pro–Pac offered on its alternate theory of damages, and the direction in Rule 15 that amendments are to be "freely allowed," the Court concludes that the unjust enrichment claim should be considered.

▮ "In Wisconsin unjust enrichment is a legal cause of action governed by equitable principles. The action is 'grounded on the moral principle that one who has received a benefit has a duty to make restitution where retaining such a benefit would be unjust.' " *Lindquist Ford, Inc. v. Middleton Motors, Inc.,* 557 F.3d 469, 476–77 (7th Cir.2009) (citation omitted). To support a claim of unjust enrichment, a plaintiff must prove three elements: "(1) a benefit conferred upon the defendant by the plaintiff, (2) appreciation by the defendant of the fact of such benefit, and (3) acceptance and retention by the defendant of the benefit, under circumstances such that it would be inequitable to retain the benefit without payment of the value thereof." *Id.* at 477 (citation omitted). If a plaintiff can satisfy each of these elements, damages are appropriate. Measurement of damages is "limited to the value of the benefit conferred on the defendant." *Id.*

▮ Pro–Pac easily satisfies each element of unjust enrichment. First, Chapes

MR. HANUS: Objection.
THE COURT: Overruled. (Trial Tr. Vol. 3, 134, 135.)

conferred the benefit of the Vangard referral directly on WOW by calling Wally. Second, WOW expressed appreciation of the benefit by compensating Chapes for the referral. Third, WOW acted on the referral, secured a lease, and continues to service the Vangard account. Additionally, Chapes accepted the compensation that WOW offered to him and later became an employee of WOW. The acceptance of the Vangard deal by WOW while negotiations with Pro–Pac were pending and Chapes' acceptance of the referral fee as a fiduciary of Pro–Pac constitute benefits that are inequitable to retain under the facts in this case.

■■■ Here, the benefit conferred upon Chapes was the $6,490 referral fee paid by WOW. Pro–Pac computes its unjust enrichment claim against WOW as $385,000, based on WOW's counteroffer as stated in Sarna's July 31, 2006 email to Wally. In that email, Sarna confirmed the most recent negotiations and summarized WOW's pending offer as one month free rent per year, a second month free rent per year once Chapes filled warehouse space for WOW, and an extension of the lease on the East Troy Warehouse (including the two free months per year) from three years to five years. (WOW Ex. 1003.) Pro–Pac's monthly rent was $38,500. (Pro–Pac Ex. 17, pp. 0029.) Sarna's testimony reiterated the terms that Wally offered: "He had said that he couldn't guarantee that we could get three free months right away. He offered us one month free and a second month if Mr. Chapes was able to close a deal. And if he was then the best of the terms—the extension the lease would be— would be covered on that." (Trial Tr. Vol. 1, 74.) According to Pro–Pac's calcula-

tions, two months' free rent each year would equate to $77,000, and over the five years of the extended lease, that concession would equate to a $385,000 benefit for Pro–Pac. Instead, by walking away from the negotiations without disclosing that Chapes had actually helped WOW fill warehouse space through the Vangard referral, WOW absolved itself from giving up $385,000 in rent. Jamie Wally's testimony does not exactly confirm the terms on which Pro–Pac bases its unjust enrichment damages. When cross-examined about the counteroffer of one month free with another month when Chapes closed a deal, he recalled,

A Right. Well we offered—I think originally there was a three month offer from Dave. We came back, I believe, it was one month. And then the counter was two months free and then if—you know, once George closes his first deal then we throw in that third month that we were trying to negotiate in the first—

Q I see. So sort of like a base of one and then sort of a contingency if he closes the first deal—

A That's what Dave had offered, correct.

(Trial Tr. Vol. 3, 128.) However, Wally also testified that WOW was willing to offer an additional month of free rent, although, "I probably wouldn't have signed up for one month per deal because we wouldn't know the size and profitability of each deal." (*Id.* at 127.) Sarna's testimony and the July 31 email directly contradicts Wally's testimony, and the Court resolves this credibility dispute in Sarna's favor,[12] finding that WOW's offer, as of the

---

12. Wally's evasive testimony about his telephone conversations with Chapes on July 31, 2006 supports this conclusion. In the midst of the intense negotiations for Chapes' ser-

vices, he first cannot recall whether he had any conversations with Chapes. When Pro–Pac's attorney offers to show him the telephone logs showing that he had two tele-

date of the Vangard referral, was one month free rent, with another month free when Chapes closed a deal, and an extension of the lease term from three years to five years. By aiding and abetting Chapes' breach of his fiduciary duty, and keeping the Vangard referral secret in the midst of the negotiations, WOW benefitted by the sum of $385,000.

### The evidence supports an award of punitive damages

■■■■ Pro–Pac contends the Court should award punitive damages. "The plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." Wis. Stat. § 895.043(3) (2007). Specifically, the evidence must show that the defendant's conduct is "(1) deliberate, (2) in actual disregard of the rights of another, and (3) sufficiently aggravated to warrant punishment by punitive damages." *Berner Cheese Corp.*, 312 Wis.2d 251, ¶¶ 63–65, 752 N.W.2d 800 (citing *Strenke v. Hogner*, 2005 WI 25, 279 Wis.2d 52, 694 N.W.2d 296). This burden does not require a plaintiff to show that defendant intended to cause harm or injury to the plaintiff. *D.L. Anderson's Lakeside Leisure Co. v. Anderson*, 2008 WI 126, ¶ 77, 314 Wis.2d 560, 757 N.W.2d 803 (citing *Wischer v. Mitsubishi Heavy Indus. Am., Inc.*, 2005 WI 26, ¶ 61, 279 Wis.2d 4, 694 N.W.2d 320).

The question is whether Pro–Pac proved that WOW and Chapes acted maliciously or sought to intentionally disregard Pro–Pac's rights. *See Third Educ. Group, Inc. v. Phelps*, 675 F.Supp.2d 916, 931 (E.D.Wis.2009). The Court concludes that Pro–Pac established that Chapes' and WOW's conduct was deliberate, in disregard of Pro–Pac's rights, and sufficiently aggravated under the circumstances.

The record is rife with deliberate conduct. Chapes touted his contacts, specifically with Vangard's Van Denend, when interviewing for a job with Pro–Pac. He was hired, paid handsomely, and tasked with using his contacts to build Pro–Pac's warehousing business. Instead, he steered those contacts to WOW, as Wally admitted at his first meeting with Sarna. When Sarna learned that WOW was benefitting from Chapes' contacts while on Pro–Pac's payroll, Sarna attempted to legitimize WOW's use of Chapes and obtain rent concessions for Pro–Pac. Just as the negotiations were coming to a head, Chapes diverted the Vangard deal to WOW without disclosing it to Sarna. Without leverage to demonstrate Chapes' value, Sarna believed he had no choice but to let the negotiations with WOW dissolve. Unbeknownst to Sarna, WOW was not negotiating for Chapes' services in good faith. WOW kept the Vangard deal secret although it clearly benefitted WOW in filling the Aurora warehouse. With Sarna out of the picture, convinced that WOW rejected his counteroffer for valid business reasons, WOW compensated Chapes for the referral "under the table," saving itself thousands of dollars in rent concessions.

The record contains additional examples of the blatant disregard of Pro–Pac's rights. Chapes was a Pro–Pac employee, yet Chapes and Wally spoke frequently without Sarna's knowledge. Chapes was told to "do nothing for WOW," but the

---

phone calls with Chapes on the very morning of Sarna's email summarizing the offer and counteroffer, Wally suggests the conversations were about baseball. (Pro–Pac Ex. 55.5, 58.1.) Moreover, the frequency of telephone conversations between Wally and Chapes on the day of and day after the Van Denend call casts serious doubt on Wally's testimony about Chapes' limited involvement in the referral. (Pro–Pac Post–Trial Br. 15.)

telephone logs show dozens of conversations between Wally and Chapes. After filing the Chapter 11 petition, Sarna told WOW explicitly in writing not to contact Chapes regarding negotiations for Pro–Pac to sell its assets to WOW. (Pro–Pac Ex. 35.) WOW responded by purchasing a private disposable cell phone for Chapes. (Pro–Pac Ex. 36.)

The evidence demonstrates that Chapes' and Wally's conduct are sufficiently aggravated to warrant punitive damages. A little more than a month after the Vangard deal, while Chapes was still employed by Pro–Pac, WOW sought additional transportation work from Vangard and sent quotes to Chapes as WOW's contact at Vangard. (Pro–Pac Ex. 24; Trial Tr. Vol. 3, 143.) Then in October 2006, WOW used Chapes' connection with Pets International to solicit business from Pets, a current Pro–Pac customer. (Pro–Pac Ex. 30.) Both the quotes for Vangard and contact with Pets were hidden from Pro–Pac by WOW and Chapes. (Trial Tr. Vol. 1, 141,–142.) Chapes denied these contacts at trial, but Pro–Pac rebutted the claim with records from its internal time keeping and calendaring system, known as the "ACT" system, and an email sent to Chapes by WOW's Jamie Dutter. (Pro–Pac Ex. 30, 49.) Chapes claimed he never used Pro–Pac's time keeping system; that he did not have an ACT password; that he had agreed to keep his whereabouts on a notepad and to inform the Sarnas of where he was going and what he was doing; and that the Sarnas must have made the entries. (Trial Tr. Vol. 3, 204, 205.) Yet, the log entries in the ACT system detail visits to Chapes' own doctors and the purposes for the visits. (Pro–Pac Ex. 49.) It is simply not plausible that the Sarnas would have made such personal entries on Chapes' behalf. Instead, it is clear that Chapes' testimony lacks credibility.

■■■■■■ The final issue is the amount of punitive damages to award. Pro–Pac seeks an award of three times the damages award. "An award is excessive, and therefore violates due process, if it is more than necessary to serve the purposes of punitive damages, or inflicts a penalty or burden on the defendant that is disproportionate to the wrongdoing." *Trinity Evangelical Lutheran Church and School–Freistadt v. Tower Ins. Co.*, 2003 WI 46, ¶ 50, 261 Wis.2d 333, 355, 661 N.W.2d 789, 799, *cert. denied*, 540 U.S. 1074, 124 S.Ct. 925, 157 L.Ed.2d 743 (2003). To determine the bounds of reasonable punitive damages, the Court analyzes several factors,[13] most importantly, the "degree of grievousness or reprehensibility involved" in the defendant's conduct. 261 Wis.2d 333, ¶ 50, 661 N.W.2d 789.

For example, in *D.L. Anderson's Lakeside Leisure Co.*, the Wisconsin Supreme Court reviewed the reasonableness of a $180,000 punitive damage award to buyers of marine business for the seller's breach of a noncompetition clause within the asset purchase agreement and infringement of the buyers' trade name. 314 Wis.2d 560, 757 N.W.2d 803. The court determined that the award was not excessive because the seller acted in intentional disregard of the buyers' rights when he chose a trade

---

**13.** "When applying a virtual identical test Wisconsin courts have been encouraged to consider, from the following, those factors which are most relevant to the case, in order to determine whether a punitive damages award is excessive: 1. The grievousness of the acts; 2. The degree of malicious intent; 3. Whether the award bears a reasonable relationship to the award of compensatory damages; 4. The potential damage that might have been caused by the acts; 5. The ratio of the award to civil or criminal penalties that could be imposed for comparable misconduct, and 6. The wealth of the wrongdoer." *Trinity Evangelical Lutheran Church*, 261 Wis.2d 333, ¶ 53, 661 N.W.2d 789.

name that was similar to the buyers' trade name, and the seller knew the name would be familiar to potential customers. The court agreed with the buyers that credible evidence showed the seller deliberately used an infringing name and that public policy supported punitive damages to deter unlawful infringement. The court affirmed the $180,000 punitive damages award, doubling the $90,000 total compensatory damages awarded on both the contract claim and the trade name infringement claim.

In contrast, *Third Education Group, Inc.*, demonstrates that it is not appropriate to award punitive damages, even in the amount of attorneys' fees, where the defendant has not acted maliciously or intentionally. 675 F.Supp.2d 916. In that case, a publishing corporation and owner sued a former co-owner, stemming from competing rights to the corporation's name. The court found that the plaintiff failed to establish that the co-owner lacked a good-faith belief that he owned the copyright to certain website materials. Therefore, an award of punitive damages under Wisconsin law was not justified.

This case is more analogous to *D.L. Anderson's Lakeside Leisure Co.* than *Third Education Group, Inc.* Pro–Pac demonstrated WOW's and Chapes' lack of good faith. WOW and Chapes knew that Sarna was angling for rent concessions if Chapes made a referral that helped WOW fill warehouse space. But Chapes and Wally hid the Vangard referral, and Wally rewarded Chapes with a surreptitious commission, rather than grant any rent concessions to Pro–Pac. Sarna characterized his relationship with Chapes as "open and honest," but it appears that it was neither open nor honest on Chapes' part. Sarna insisted that Wally keep him informed of negotiations with Chapes. Wally denied that, but the November 28, 2006 letter confirms Sarna's testimony. Wally responded by purchasing a secret cell phone for Chapes, to facilitate his consultations with Pro–Pac's key employee. Under the circumstances, the evidence supports an award of punitive damages of $50,000 against each Chapes and WOW.

### Conclusion

The Court concludes that Chapes breached his fiduciary duty to Pro–Pac, and that WOW aided and abetted that breach. Chapes and WOW were unjustly enriched by their conduct, and in equity should not retain the benefit of Pro–Pac's lost opportunity. The actual damages against Chapes are computed as the $6,490 referral fee he received from WOW. The actual damages against WOW are $385,000, representing two months' rent on the East Troy lease for a total of five years. Additionally, for their proven intentional disregard of Pro–Pac's rights, the Court awards punitive damages of $50,000 against Chapes, and $50,000 against WOW. A separate Order will be entered granting judgment in those amounts in favor of Pro–Pac.

WOW filed a Counterclaim that now is ripe for determination. The parties should contact the Court to schedule a pretrial conference on trial of the Counterclaim.